

FILED

05/16/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 2, 2017

## JALEEL JOVAN STOVALL v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Hardeman County**
**No. 2011-CR-101   J. Weber McCraw, Judge**

———————————————————

### No. W2016-01981-CCA-R3-PC

———————————————————

The Petitioner, Jaleel Jovan Stovall, was convicted by a Hardeman County jury of rape of a child and received a sentence of twenty-five years at 100% service. The Petitioner filed a petition for post-conviction relief, which asserted that he was denied effective assistance of counsel. The post-conviction court denied relief. On appeal, the Petitioner argues that trial counsel's performance was deficient for failing to object to hearsay introduced by the State and for failing to argue that a letter allegedly authored by the Petitioner was not properly authenticated. After a thorough review of the record and applicable case law, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined. J. ROSS DYER, J., not participating.

Matthew C. Edwards, Bolivar, Tennessee, for the appellant, Jaleel Jovan Stovall.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; D. Mike Dunavant, District Attorney General; and Joe Van Dyke, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

#### I. Factual and Procedural Background

In 2011, the Petitioner was indicted for rape of a child. *State v. Jaleel Jovan Stovall*, No. W2013-02553-CCA-R3-CD, 2014 WL 6482827, at *1 (Tenn. Crim. App.

Nov. 18, 2014), *no perm. app. filed*. The record on appeal reveals that the Petitioner initially pled guilty to rape of a child and received a fifteen-year sentence at 100%. The Petitioner then filed a petition for post-conviction relief and argued that previous trial counsel provided ineffective assistance of counsel. The State agreed to allow the Petitioner to withdraw his guilty plea and to reinstate the indictment.

In our opinion affirming the Petitioner's conviction on direct appeal, this court summarized the evidence presented at the Petitioner's trial as the following:

At trial, Kevin Crawford, City of Galloway Chief of Police, testified that he received a call on June 17, 2010, from the Hardeman County Community Health Center that a female juvenile had a positive pregnancy test. He arrived at the center and spoke with S.F., who was eleven years old at that time, and her mother, V.F.[1] After talking with them, Chief Crawford "determined that [the victim] had had sexual contact with an individual that was staying temporarily at [the] house and visiting back in April, around the—April 8th, April 9th." The victim identified the then eighteen-year-old [Petitioner] as the man who came into her room during the night and forced her to have sexual intercourse. Chief Crawford set up a forensic interview for the victim.

Chief Crawford then proceeded to locate the [Petitioner] and interviewed him. The [Petitioner] denied any sexual contact with the victim, but he provided Chief Crawford with the following explanation:

He did admit that he had stayed at the house during the time that [the victim] became pregnant, advised that he d[id] not recall having any sexual contact with her, that he had came (sic) home, had been under the influence of alcohol and marijuana, and that—stated that if she was pregnant by him, that undoubtedly after he passed out that she had taken a turkey baster and got herself pregnant trying to frame him.

The victim testified that the [Petitioner] occasionally spent the night at her house during the early months of 2010. The victim said that her family was having a barbecue at the house one day, that the [Petitioner] was walking around the neighborhood alone, so her mother's boyfriend invited him over, and that the [Petitioner] then began "hanging" around their

---

[1] The victim's mother was referred to as V.F. to safeguard the victim's name from being revealed in the direct appeal opinion. For continuity we will refer to the victim's mother as V.F.

house. According to S.F., approximately one month later, the [Petitioner] came into her room at night, hit her in the ear, and told her that, if she said anything, then he would hurt her. The [Petitioner] forced her to have sex with him. According to the victim, the [Petitioner] did not appear intoxicated on this evening. The victim acknowledged that she did not tell anyone about the incident until her positive pregnancy test.

The victim stated that the [Petitioner] knew she was only eleven years old, describing, "I got off the bus one day, doing my homework. He saw the grade on my book, . . . and he asked me how old was I and I told him [eleven]." Moreover, the victim said that she did not have any type of relationship with the [Petitioner] and confirmed that her baby was born on December 14, 2010.

According to the victim, the [Petitioner] called her house after his arrest and wrote her letters. One letter, admitted into evidence, read as follows:

> I know that we haven't talked in a while but I just want to let you know that you and my daughter stay in my thoughts. I just want to tell you that we can be a family if you let us be. I want to be there for you and my daughter. So please when my trial date comes around don't even show up. And if they come to your house to try to serve you a subpoena don't even answer the door. I know that you know my whole name so please send me some pictures of my daughter please. I am back at the county jail so you should have the address. Well, hopefully you'll do all these things for me so that we can be a family once again. J

The victim's mother's testimony provided many of the same details. Importantly, her mother, V.F., stated that she "let it be known when [the Petitioner] first started coming around how old [the victim] was [and] what grade [the victim] was in . . . ." V.F. testified further that the [Petitioner] was with her at times when the victim got off of the school bus and that the [Petitioner] helped the victim with her homework a couple of times. V.F. confirmed that the [Petitioner] occasionally stayed at her house as an overnight guest, although he lied to her that he had been locked out of the house where he was staying in order to secure an invitation. On the occasions when the [Petitioner] slept on her couch, the [Petitioner] did not appear under the influence of drugs or alcohol according to V.F.

In the spring and summer of 2010, V.F. noticed the victim's behavior start to change. V.F. described this change as follows:

> She went crazy, to be, you know—I mean, she started cutting on herself. She would wake up through the night hollering and screaming. She'd take baths five or six times a day, like, you know, something that she was just nasty. She would take baths constant[ly] from the time she'd get—if she got up in the morn—that night to take a bath for school, she'd get up in the morning and take a bath. When she got out of school, she was constantly just washing herself. She started cutting her wrists. She was jumping up out of her sleep, speaking in tongue[s] . . . . When she woke up, her eyes were wobbling in the back of her head and she'd be hollering and screaming and crying.

V.F. opined that this behavior change happened after the alleged rape. V.F. further described incidents where someone would knock on the door, and the victim would say to her that if it was the [Petitioner], then do not let him in. V.F. sought assistance for the victim's mental health issues.

The victim was fifteen weeks pregnant by the time she received a physical examination. Paternity testing [showed that] . . . the probability that the [Petitioner] was the father of the victim's child was 99.999998%.

The [Petitioner], whose date of birth was March 10, 1992, testified on his behalf. He stated that, after being released from juvenile detention in Madison, Wisconsin, he came to stay with his uncle in Hardeman County in the spring of 2010. According to the [Petitioner], he met the victim approximately two to three weeks after his arrival. He claimed that, in the month or so that followed, he and the victim developed a romantic relationship, that the victim told him she was seventeen years old, and that the victim's mother confirmed her age. The [Petitioner] was shown a photograph of the victim taken around the time of the alleged rape, which had previously been admitted into evidence, and the [Petitioner] opined that she did in fact look seventeen in the photograph. The [Petitioner] denied that he ever helped the victim with her homework.

The [Petitioner] admitted that he had sexual intercourse with the victim but denied that he ever hit the victim or forced himself on her, and

- 4 -

he stated that he continued to visit the family regularly after the alleged rape. As for his untrue statements to Chief Crawford, the [Petitioner] explained that he felt intimidated and was "highly confused" at that time. The [Petitioner] also admitted that he phoned the victim from jail on several occasions and that he had spoken with the victim. As for the letter previously admitted into evidence, the [Petitioner] acknowledged that the letter did express his actual feelings, but he denied authoring the letter.

*Id.* at *1-3. The jury found the Petitioner guilty, and the trial court sentenced the Petitioner to a twenty-five-year sentence at 100%. *Id.* at *3. On appeal, this court affirmed the Petitioner's conviction for rape of a child. *Id.* at *4. The Petitioner did not seek further review of his conviction from our supreme court.

### Post-Conviction Proceedings

The Petitioner filed a timely pro se petition for post-conviction relief,[2] contending that he received ineffective assistance of counsel. At the post-conviction hearing, trial counsel testified that he was appointed to represent the Petitioner in his initial post-conviction petition, which asserted claims of ineffective assistance of counsel against previous trial counsel. He met with the Petitioner, "reviewed all of the previous documents that were in the court file, reviewed the statutes with [the Petitioner], reviewed what his reason was [for seeking post-conviction relief], . . . and explained [his] opinion of what [the Petitioner's] plea was and what [the Petitioner] was possibly looking at and how the process worked." Trial counsel filed an amended petition for post-conviction relief but informed the Petitioner that, if he proceeded to trial, he could receive a twenty-five year sentence at 100% instead of the fifteen-year sentence that he received under the plea agreement. After the State reinstated the indictment against the Petitioner, trial counsel met with the Petitioner on "multiple occasions" in the county jail "to discuss trial preparation, to discuss the facts of the case, to discuss the indicted charge and what that actually carried."

Trial counsel stated that the Petitioner asked him to investigate issues related to his case, which trial counsel did. Trial counsel noted that the Petitioner wanted a witness, Eric Cheairs, to testify on his behalf at trial; trial counsel investigated Mr. Cheairs and

---

[2] Before the post-conviction court, the State filed a motion to dismiss the petition and argued that the petition was untimely filed because this court's opinion on the Petitioner's direct appeal was filed on November 18, 2014 and the petition was stamped as filed on December 10, 2015. It does not appear that the post-conviction court addressed this issue. However, on appeal, the State acknowledges that in his pro se petition, the Petitioner stated that he mailed the petition on November 15, 2015. We, therefore, conclude the pro se petition was timely filed. *See* Tenn. R. Crim. P. 49(d)(1).

learned that "he was actually a convicted felon and had an active warrant out for his arrest[.]" Trial counsel advised the Petitioner against calling Mr. Cheairs. Trial counsel testified that he spoke with the Petitioner's mother. Trial counsel stated that, although she agreed to give information to trial counsel and to attend the Petitioner's trial, trial counsel did not receive any information from the Petitioner's mother, and she did not attend the Petitioner's trial. Additionally, trial counsel noted that "[t]here was another individual that [the Petitioner] had mentioned that actually showed up on the day of trial who [trial counsel] had never even talked to before that wanted to testify on [the Petitioner's] behalf." Trial counsel spoke to this witness in the hallway, but he explained that "[t]here was no way [that he] could prepare her to be available to testify at that time."

Trial counsel stated that, prior to the Petitioner's trial, he negotiated with the State for a plea agreement because "[the Petitioner] had requested that [trial counsel] get him another plea offer[.]" However, the Petitioner declined the State's plea offer for a fifteen-year sentence at 100%. Trial counsel informed the Petitioner how he believed the trial would proceed based on the Petitioner's charge. He noted that the Petitioner's charged offense, rape of a child, was "in essence, a strict liability crime." Trial counsel explained that, in the Petitioner's case, "there was a child born of the sexual contact and that [the] paternity test showed that [the Petitioner] was a hundred percent the father, so at that point in time[,] for all intents and purposes[,] there was no defense[.]" In trial counsel's opinion, the witnesses that the Petitioner wanted to call at trial were not present during the alleged offense, and "they would not have had any ability to negate that evidence."

Regarding the Petitioner's allegation that trial counsel failed to object to the State's introduction of hearsay statements, trial counsel stated that, in his opinion, "[n]one of those objections . . . would have made any difference in the result of the trial." Trial counsel stated that V.F.'s testimony of her observation of S.F.'s behavior was not inadmissible hearsay. Trial counsel agreed that there were times when he did not object to the admission of a hearsay statement as a part of his trial strategy. He explained that, during the trial, he observed the demeanor of V.F. and S.F., as well as the jury's demeanor, and that he did not want to alienate the jury by "constantly standing up and objecting to hearsay that's not going to make any difference[.]" Trial counsel noted that because the Petitioner admitted to having sexual contact with S.F. and because the Petitioner was determined to be the father of S.F.'s child, the admission of the hearsay statements did not affect the jury's verdict.

On cross-examination, trial counsel noted that the Petitioner received a mental health examination during previous trial counsel's representation and that the Petitioner was again examined during trial counsel's representation. Regarding the letter allegedly authored by the Petitioner that the State introduced at trial, trial counsel stated that he received a copy of the letter before trial. Trial counsel noted that the letter was signed "J"

and that S.F. testified at trial that she received the letter from the Petitioner. At trial, the Petitioner denied that he sent the letter, but he said that the letter expressed his thoughts about the offense. Trial counsel agreed that it was unclear at trial whether the Petitioner mailed the letter to S.F. from the county jail or whether the Petitioner gave the letter to another individual to deliver to S.F. Trial counsel agreed that an unsigned letter with an undetermined source could be considered inadmissible hearsay and that he should have objected to the admission of the letter. However, trial counsel stated that "in [his] opinion[,] that letter would not have had any influence on the result of the trial[.]"

On redirect examination, trial counsel stated that he reviewed the letter at issue and questioned the Petitioner about it. He explained that "taking the letter, having known about the case, and looking at it as a whole, it would be tough for someone to deduce that someone other than [the Petitioner] wrote that letter." If he had objected to the admission of the letter, trial counsel believed that the trial court would have likely overruled the objection and admitted the letter.

In an order filed on August 29, 2016, the post-conviction court denied relief. The post-conviction court found that, regarding the introduction of the Petitioner's letter, trial counsel "agreed that an objection should have been made, but it would not have changed the outcome." The post-conviction court credited the testimony of trial counsel. The post-conviction court concluded that trial counsel "provided adequate assistance; he met with [the P]etitioner and discussed the case, including possible defenses and negotiated plea opportunities." The post-conviction court also concluded that the Petitioner "failed to show any deficient performance by [trial counsel] or that he was prejudiced." The Petitioner timely appeals the post-conviction court's decision.

## II. Analysis

On appeal, the Petitioner asserts that trial counsel rendered deficient performance by failing to object when: (1) the State introduced hearsay through the testimony of V.F., and (2) the State introduced a letter allegedly written by the Petitioner through the testimony of S.F. The State contends that the Petitioner "fails to show that [trial] counsel was deficient for failing to object or a reasonable probability that, but for [trial] counsel's unprofessional errors, the trial result would have been different."

*Standard of Review*

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound

by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

*Ineffective Assistance of Counsel*

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley,* 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

### *Failure to object to hearsay in V.F.'s testimony*

The Petitioner asserts that trial counsel's failure to object to hearsay introduced during V.F.'s testimony was deficient. The State contends that V.F.'s statement was not inadmissible hearsay, and therefore, trial counsel's decision to not object to its introduction was reasonable.

The following exchange occurred at the Petitioner's trial involving the alleged hearsay statement:

> [THE STATE]: Okay. How did [S.F.] react when [the Petitioner] would come to the house at that point?
>
> [V.F.]: She would –[l]ike when we would be sitting on the couch and somebody knocked at the door, she would be like "Momma, if that's [the Petitioner], don't let him in.["] She would just tell me[,] don't let him in. If he would come over [to] my house to hang out with us, she would make sure she would leave or be gone.

Trial counsel admitted that V.F's statement included inadmissible hearsay; however, he stated that he did not object because he did not want to alienate the jury by "constantly standing up and objecting to hearsay[.]" Trial counsel also noted that, even if he had objected to this statement and the trial court had sustained his objection, the Petitioner would, in all probability, still have been convicted because of the strength of the State's evidence. The post-conviction court did not make any specific findings regarding this allegation, but credited trial counsel's testimony and concluded that the Petitioner failed to establish that trial counsel's performance was deficient or that the Petitioner was prejudiced by trial counsel's performance.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Unless the hearsay statement falls under an exception, it is not

admissible at trial. Tenn. R. Evid. 802. While V.F.'s statement included hearsay from S.F., we conclude that the Petitioner has failed to establish that trial counsel's decision to not object was deficient or that he was prejudiced by trial counsel's decision. Trial counsel stated that he did not object to the hearsay statement because he did not want to alienate the jury; this is a reasonable trial strategy that we will not second-guess. *See Granderson*, 197 S.W.3d at 790. Additionally, it is clear from the record that the evidence presented at trial weighed strongly against the Petitioner. The Petitioner admitted to having sexual contact with S.F., and a paternity test revealed that the Petitioner was the father of S.F.'s child. The State established that S.F. was eleven years old and that the Petitioner was eighteen years old at the time of the offense. He is not entitled to relief on this ground.

### *Failure to object to the introduction of the letter*

The Petitioner contends that the State introduced inadmissible hearsay through S.F.'s testimony when she read a letter that was allegedly authored by the Petitioner. The Petitioner asserts that trial counsel's performance was deficient because he did not object to the letter's introduction on grounds of hearsay and failure to authenticate the letter. The State argues that the letter was not inadmissible hearsay because "the victim's recitation of the letter repeated the [P]etitioner's own statements." Additionally, the State argues that trial counsel "made an informed decision that challenging the authentication of the letter was not in the [P]etitioner's strategic best interest after a thorough investigation of the law and facts."

The following exchange occurred during the admission of the letter at issue into evidence:

[THE STATE]: Did [the Petitioner] ever send you any letters?

[S.F.]: Yes, sir, through other people.

[THE STATE]: I'm going to hand you a document and I'm going to ask if you can identify this. I think [trial counsel] has a copy of the letter. Ma'am, can you identify that?

[S.F.]: Yes, sir.

[THE STATE]: What is that, please?

[S.F.]: A letter from [the Petitioner].

- 10 -

[THE STATE]: Would you read it to us?

[S.F.]: "I know that we haven't talked in a while but I just want to let you know that you and my daughter stay in my thoughts. I just want to tell you that we can be a family if you let us be. I want to be there for you, my daughter. So please when my trial date comes around don't even show up and if they come to your house to try to serve you a subpoena, don't even answer the door. I know that you know my whole name so please send me some pictures of my daughter please. I am back at the county jail so you should have the address. Well, hopefully, you will do all these things for me so that we can be a family once again. J"

[THE STATE]: Judge, I'd like to ask that that be admitted as Exhibit 2 for the State.

At the post-conviction hearing, trial counsel agreed that an unsigned letter with an undetermined source could be considered inadmissible hearsay and that he should have objected to the letter at issue; however, he stated that "in [his] opinion[,] that letter would not have had any influence on the result of the trial[.]" He believed that, if he had objected to the admission of the letter, the trial court would have likely overruled the objection and admitted the letter. The post-conviction court credited the testimony of trial counsel and found that, regarding the introduction of the Petitioner's letter, trial counsel "agreed that an objection should have been made, but it would not have changed the outcome."

We agree with the post-conviction court's conclusion that the Petitioner has failed to establish that he was prejudiced by trial counsel's failure to object to the introduction of the letter. While it is unclear from the record who wrote the letter and how it ended up in S.F.'s possession, it is unlikely that the jury's verdict would have been different if the letter had been excluded from evidence. As we have previously noted, the evidence weighed strongly against the Petitioner. He is not entitled to relief on this ground.

### III. Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE